UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KIM AULISIO, | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 11-30027-KPN |
| | ) | |
| | ) | |
| | ) | |
| BAYSTATE HEALTH SYSTEMS, INC. | ) | |
| and AL CALVANESE, | ) | |
| Defendants | ) | |

MEMORANDUM AND ORDER WITH REGARD TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (Document No. 22)
September 7, 2012

NEIMAN, USMJ

Kim Aulisio ("Plaintiff") brought this action alleging employment discrimination

against her former employer, Baystate Health Systems, Inc. ("Baystate"), and

supervisor, Al Calvanese ("Calvanese") (together "Defendants").  Presently before the

court is Defendants' motion for summary judgment on Counts One through Five and

Seven of Plaintiff's complaint, which are: disability discrimination and harassment

pursuant to Mass. Gen. Laws c. 151B against Baystate (Count One), disability

discrimination and harassment under the Americans with Disabilities Act ("ADA"), 42

U.S.C. §§ 12101-12213, against Baystate (Count Two), retaliation pursuant to Mass.

Gen. Laws c. 151B against Baystate (Count Three), retaliation under the ADA against

Baystate (Count Four), disability discrimination and harassment pursuant to Mass.

Gen. Laws c. 151B against Calvanese (Count Five), and retaliation pursuant to Mass.

Gen. Laws c. 151B against Calvanese (Count Seven). Plaintiff's ADA claims against Calvanese, Counts Six and Eight, were dismissed by District Judge Michael A. Ponsor on June 1, 2011.

The parties have since consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the reasons which follow, the court will grant Defendants' motion.

## I. STANDARD OF REVIEW

When ruling on a motion for summary judgment, the court must construe the facts in a light most favorable to the non-moving party. *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). With regard to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

## II. FACTUAL BACKGROUND

Pursuant to Local Rule 56.1, the party moving for summary judgment must provide the court with a statement of undisputed facts, to which the non-moving party must respond with those facts it deems disputed, accompanied by supporting documentation. Here, unfortunately, Plaintiff's version of facts in dispute was not the concise statement envisioned by the rule, causing the court to grant in part Defendants' motions to strike. (See Document Nos. 31 and 32.) With that ruling in mind, together with the background information provided by the parties, the court recounts the undisputed facts below, noting, where appropriate, certain facts which remain in dispute but which, in the court's view, are not genuine or material enough to forestall dismissal.

Plaintiff began working for Baystate in 2000 as a switchboard operator and then as a Patient Accounting Medicaid Billing clerk. In September of 2009 Plaintiff was promoted to Coordinator in the Health Information Management ("HIM") Department, where she began reporting to Calvanese. At the time she was promoted, Calvanese gave Plaintiff the HIM Coordinator job description instead of the Recovery Audit Coordinator ("RAC") description; because of that, Plaintiff now claims, she was never adequately trained for the new position. Plaintiff, however, never told anyone that she was given the wrong job description. She did ask Calvanese for additional training (although she does not specify when), which requests were denied. (Ex. 1; Aulisio Dep. 80.)

As the HIM/RAC Coordinator, Plaintiff was responsible for responding to

3

auditors' request letters, gathering medical records from other employees, and ensuring that auditors received them in a timely fashion. Plaintiff's job responsibilities later changed somewhat when she was assigned with overseeing "coding" audits rather than RAC audits.

In January of 2010, Calvanese spoke with Plaintiff after certain records were not promptly sent out to the auditor; Plaintiff left the records with a receptionist for pick up by FedEx. Plaintiff admitted that it was her responsibility to make sure the records went out on time but explained that it "wasn't part of her process" to make sure that FedEx actually picked up the documents. (Aulisio Dep. 86-87.) Although the records were ultimately received on time, Calvanese clarified to Plaintiff that ensuring that the records made it out the door on time was within the scope of her job responsibilities. (Defs.' SOF 13.)

In March of 2010, an auditor told Calvanese that an audit deadline had been missed. Calvanese questioned Plaintiff, who insisted that the deadline had not been missed because she had asked for and had been granted an extension. The auditor subsequently told Calvanese that no extension had been filed. For her part, Plaintiff still maintains that she never missed an audit deadline (Pl.'s SOF 18); Defendants counter that audits were missed, offering in support documents indicating the rejection of certain claims due to untimely receipt of records during Plaintiff's tenure. (Defs.' SOF 18.)

Also in March, Calvanese learned for the first time that Plaintiff wore a hearing aid when it broke and Plaintiff requested time off to replace it. Calvanese granted the

request but never otherwise discussed Plaintiff's hearing aid with her.  At the same time that Plaintiff had her hearing aid repaired, she underwent an auditory test and learned that she needed an additional hearing aid in her left ear, which she received during that same visit.  (Ex. 1; Aulisio Dep. 39-41.)

Some other events unfolded in March and April of 2010.  First, on April 2, 2010, Plaintiff provided the wrong records to an auditor visiting Baystate (although gathering such records was not her responsibility); after providing the records, Plaintiff left the premises, leaving the auditor waiting for a few hours for the proper records; eventually another employee spoke with the auditor and provided the appropriate records. Second, on April 6, 2010, Calvanese gave Plaintiff a written warning because she had accidentally breached Baystate's Confidentiality Policy by copying an outside vendor on an email that contained a patient's name; although, pursuant to Baystate's confidentiality policy, discipline for such a breach is a final written warning or termination, Calvanese only issued Plaintiff a written warning.  Third, Calvanese issued Plaintiff a written warning on April 6, 2010, with regard to her oversight and involvement in audits, including the two incidents described above, plus another incident on March 2, 2012, when an audit was missed because medical records were not provided on time (Pl.'s SOF 26); in response, Plaintiff asked Calvanese to change some of the wording in the warning, which he did about five weeks later.  Although aware that she could dispute written warnings through Baystate's Dispute Resolution Process, Plaintiff did not do so, choosing instead to speak with Calvanese and Jen Curtis ("Curtis"), a Human Resources representative.  (Pl.'s SOF 28.)

In early May, Calvanese received complaints about Plaintiff from yet other employees, including complaints that she made careless errors in documents she produced, would not answer questions, did not present information in a clear and concise manner, had not performed trial audits to the extent necessary, and in general was not managing them effectively. (Pl.'s SOF 30-33.)[1]

During this same time period, when Calvanese spoke with Plaintiff about her job responsibilities, he at times felt that she did not comprehend what he was saying. Plaintiff later testified that Calvanese "just kept saying that it was like I wasn't hearing him, and that I wasn't understanding what he was saying . . . you're not getting it, you're not understanding what I'm saying or what I request." (Ex. 1; Aulisio Dep. 43-44.) Also during this time, both Plaintiff and Calvanese were in contact with Curtis, who was attempting to improve Plaintiff's job performance. Plaintiff suggested that she meet with Calvanese for five to ten minutes after every meeting. Although Curtis initially thought that might work, Calvanese told Plaintiff he did not have time to meet with her after every meeting and suggested, instead, that she email him after meetings and outline her understanding of next steps, which he would review for accuracy. (Defs.' SOF 46.) For her part, Curtis advised Calvanese to make his expectations clear and do his best

---

[1] As explained in the court's ruling on Defendants' motions to strike, Plaintiff characterizes these particular facts as "disputed" without actually disputing them. Instead, Plaintiff repeats a several paragraphs-long argument relating to the inaccurate job description and her lack of proper training, which, the court assumes, is meant to excuse the employee complaints described above. Plaintiff, however, does not cite any documents or testimony that refutes or calls into question the accuracy of the complaints themselves, which Defendants support with citations to the record. As a result, the court accepts these particular facts as undisputed.

to help Plaintiff improve her performance. (Defs.' SOF 51.)

In early June of 2010, Plaintiff was placed on a one-week paid administrative leave after an outside vendor informed Calvanese that Plaintiff had not logged into the computer system to complete a mock audit exercise. (Defs.' SOF 54-56.) After investigating the matter further, Calvanese learned that Plaintiff had logged into the system but had not completed the required exercise. (Defs.' SOF 50.)

On June 25, shortly after Plaintiff returned from the administrative leave, Calvanese placed Plaintiff on a performance improvement plan ("PIP"), which set forth issues requiring correction and improvement; the PIP was to be in effect from June 25 through August 25, 2010. (Defs.' SOF 67-68.) Among the issues to be addressed were communication, team work, responsible use of resources, deadlines, and comprehension of job functions and procedures (Defs.' SOF 69); in addition, Plaintiff was to meet with Calvanese (with Curtis joining them at times) three times each month to review her progress. (Defs.' SOF 72.) After receiving the meeting schedule, Plaintiff emailed Calvanese's staff assistant and asked her to attend and take notes to ensure she understood the information presented to her. The staff assistant informed Calvanese of Plaintiff's request; after discussing the matter with Curtis, Calvanese told Plaintiff it would be inappropriate for his assistant to sit in on PIP meetings and take notes. (Defs.' SOF 73-75.) Instead, Calvanese and Plaintiff arranged for Plaintiff to engage in more active listening and repeating Calvanese's statements back to him. (Defs.' SOF 76.)

Calvanese continued to meet with Plaintiff and told her that some issues had

been resolved but that others remained outstanding. (Defs.' SOF 78-79.) Curtis was also meeting with Plaintiff at this time, assisting her with applying for other positions at Baystate and informing her that her previous department would take her back when a position became available. (Defs.' SOF 81.) At some point, Plaintiff's doctor suggested she take some time off and told her she would provide documentation in support of such leave; Plaintiff, however, decided not to do so, concerned that taking time off might cause issues with Calvanese. (Defs.' SOF 82.)

On September 1, 2010, Plaintiff emailed Calvanese asking for an accommodation because of a hearing impairment. Plaintiff wrote, in part, as follows:

> I feel I have uncovered the problem and have a solution: I have had some time to review everything that has occurred, been discussed, and been addressed regarding my write up and PIP. I have realized and had just mentioned in our last meeting that my disability regarding my hearing that it is certainly a challenge for me and feel it is the root of the 'Communication and Comprehension' issue you address with me. I wanted to let you know I am going to contact HR to see about requesting 'reasonable accommodation for hearing impairment' and assume they will direct me and notify you of what needs to be done . . . As we know, this is the first position at this level that I have had in which I am required to attend and participate in meetings w/teleconference and so forth and never was an issue in my previous position. It was frustrating me as to why this is happening and that there must be a reason why I saw and respond to things, which I think I get, and you say, respond, and expect things from me that I don't seem to acknowledge the right way or at all, this I believe is directly attributed to my hearing impairment/disability.

(Defs.' SOF 84; Ex. 12.) Plaintiff also stated in the email that she had a solution to the problem, suggesting that she write down and discuss the outcome of meetings with

Calvanese by email or in one-on-one briefings.  (Id.)  Calvanese forwarded the email to Curtis, who then sent Plaintiff a reasonable accommodation request form and told her to bring it to a PIP meeting scheduled for September 7th.  (Defs.' SOF 85.)  Curtis also notified Baystate's ADA coordinator that Plaintiff had just informed her that she had a disability that may be affecting her job performance and that she may need an accommodation.  (Defs.' SOF 86.)  Plaintiff has since acknowledged in a deposition that she had never requested a reasonable accommodation for her disability prior to her September 1, 2010 email.  (Ex. 12; Aulisio Dep. 15-16.)

At the September 7, 2010 PIP meeting, Plaintiff completed the reasonable accommodation request form together with a document about a Communication Access Real Time Translation system ("CART"), which she felt would help her.  (Defs.' SOF 87; Pl. SOF 89.)  Curtis questioned whether the CART system would address the communication problems Plaintiff was having with Calvanese, given her impression that the issue had more to do with Plaintiff's ability to comprehend what Calvanese needed from her rather than Plaintiff's inability to hear what he was saying.  (Plf.'s SOF 89, Defs.' SOF 91-92.)[2]  Curtis also expressed some concern that the CART system may

[2] Curtis later testified that, at the September 7 meeting, Calvanese had an extensive conversation with Plaintiff about a one-page document he had asked her to create.  Plaintiff responded that she had created it but, when he asked for it, she told him she could not because it was part of a manual.  In turn, Calvanese stated that he only wanted a one-page, stand-alone document, and Plaintiff again stated she had prepared it but said she could not get it because it was part of a manual.  At the conclusion of the conversation, which continued in this manner for about ten minutes, Curtis asked Plaintiff if a CART recording of that conversation would have been helpful, pointing out that there seemed to be a communication problem that would not be resolved by a transcript since, at the conclusion of the conversation, it was still unclear whether Plaintiff had complied with Calvanese's request.  (Defs.' SOF 92.)  Plaintiff

be considered an illegal recording device, if people were being recorded without their knowledge, but told Plaintiff that she would forward the documents to the ADA department, which would follow up with her.  (Defs.' SOF 89, 93.)

After the meeting, Plaintiff asked Calvanese what would happen next; Calvanese told Plaintiff that, had she not brought up her need for a reasonable accommodation, she would have "received a final written warning then termination."  (Defs.' SOF 96.) No disciplinary action, however, was taken.  Calvanese also told Plaintiff that they would wait to hear back about her request for a reasonable accommodation.  (Id.) Later that same day, Plaintiff emailed Curtis and asked if she needed anything else in connection with her request; Curtis responded that she did not and that she or the ADA Coordinator would contact her if additional information was needed.  (Defs.' SOF 97.)

The very next day, September 8, 2010, Plaintiff submitted a two-sentence written resignation in which she cited "extenuating circumstances, situation and emotional distress that I have been under in this position . . . as HIM/RAC Coordinator."  (Ex. 16.) She made no mention of her accommodation request.  In addition, Plaintiff did not attempt to utilize Baystate's Dispute Resolution Process to resolve her concern about her request for a reasonable accommodation.  (Defs.' SOF 99.)[3]  Plaintiff later testified

_____

"disputes" this fact but does so without any counter-fact or citation to the record. Accordingly, the court deems Defendants' Fact No. 92 undisputed.

   [3] Plaintiff disputes this fact, stating in response that, in the past, she had attempted to utilize Baystate's Dispute Resolution Process but Curtis told her the time had passed to do so.  (Plf.'s SOF 99.)  In support, Plaintiff cites her deposition testimony; that testimony reveals, however, that Plaintiff's efforts to utilize the process related to the written warnings she had received from Calvanese, not her request for a reasonable accommodation during the September 7, 2010 meeting.  (Ex. 1; Aulisio

that her resignation was based on her belief that nothing would come of her request for an accommodation.  (Defs.' SOF 98.)

### III.  Discussion

As indicated, Plaintiff's remaining claims for disability discrimination against both Baystate and Calvanese are grounded in the ADA and Chapter 151B of the Massachusetts General Laws.  Because "Chapter 151B is considered the state analogue to the [ADA], Massachusetts courts look to cases decided under the federal counterpart to inform its interpretation."  *Henry v. United Bank*, 686 F.3d 50, 59 (1st Cir. 2012) (citing *Sensing v. Outback Steakhouse of Florida, LLC.*, 575 F.3d 145, 153-54 (1st Cir. 2009) ("federal case law construing the ADA should be followed in interpreting the Massachusetts disability law").  Accordingly, the court will address Plaintiff's disability discrimination and harassment claims under each statute together.

As an initial matter, however, the court will address Plaintiff's argument with regard to Defendants' alleged failure to reasonably accommodate her, despite Plaintiff having failed to expressly assert such a claim in her complaint or even to specify under which statute or against whom she wishes to pursue such a claim.  Even reading the complaint generously in Plaintiff's favor, no such claim is evident.  Nonetheless, because Plaintiff has raised the issue in her memoranda and because Defendants have responded in kind, the court will assume that Plaintiff has asserted an accommodation claim and will address Defendants' motion accordingly.

A.  Reasonable Accommodation

─────────────────────────

Dep. 70.)

11

In general, "a disability discrimination claim based upon a failure to accommodate requires a plaintiff to show that: (1) she is a handicapped person within the meaning of the statute; (2) she is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the employer knew of her disability but did not reasonably accommodate it upon a request." *Henry,* 686 F.3d at 59-60 (discussing reasonable accommodation claims under both Chapter 151B and the ADA). Although Defendants argue that Plaintiff cannot meet either the second or third prongs, the court will assume for present purposes that Plaintiff is not only a handicapped person (prong one) but that she was qualified to perform the essential functions of her job (prong two), even though this latter assumption is questionable. As to the third prong, however, the court finds that Plaintiff's claim that Defendants did not reasonably accommodate her disability is not supported by the record and, given that there are no genuine or material issues of fact in dispute, the court has little choice but to allow Defendants' motion with respect to such a claim.

Employers, the parties understand, are not tasked with independently identifying and accommodating disabilities; rather, under Chapter 151B and the ADA, "it is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one." *Russell v. Cooley Dickinson Hosp., Inc.*, 772 N.E.2d 1054, 1065 (Mass. 2002) (quoting *Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996)). Likewise, to trigger an employer's responsibility to reasonably accommodate a disability, an employee's request "must be sufficiently direct and specific and must explain how the

accommodation requested is linked to some disability." *Freadman v. Metropolitan Property and Cas. Ins. Co.*, 484 F.3d 91, 102 (1st Cir. 2007). *See also Estades-Negroni v. Associates Corp. of North America,* 377 F.3d 58, 64 (1st Cir. 2004) ("Under the ADA, requests for accommodation must be express and must be linked to a disability.").

Here, Plaintiff's characterization of certain job-related requests prior to September 1, 2010, for training or other assistance as "accommodations" is simply inaccurate as a matter of both fact and law. To be sure, Plaintiff testified that she made several requests for additional job training for her new position; those requests, however, made no reference to her hearing impairment and, thus, cannot be considered requests for a reasonable accommodation. *See Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir. 2001) ("At the least, the request must explain how the accommodation requested is linked to some disability."). Similarly, Plaintiff's request to have someone sit in on her meetings with Calvanese to take notes was equally deficient given the absence of any indication by Plaintiff that her request was related to a hearing impairment. *See Freadman*, 484 F.3d at 103 (holding that employee's accommodation claim fails absent evidence that employer was put on notice of a "sufficiently direct and specific" request for accommodation) (quoting *Reed*, 244 F.3d at 261). Thus, Plaintiff has simply failed to support her reasonable accommodation claim with reference to any events prior to September 1, 2010. Indeed, as described, Plaintiff herself concedes this point; she testified at her deposition that her first request for a reasonable accommodation based on her hearing impairment was made on September

1, 2010, a concession which undermines any characterization of her earlier communications as requests for accommodations under Chapter 151B or the ADA.

In contrast, it is undisputed that in the September 1, 2010 email quoted above, Plaintiff asked for a reasonable accommodation related to her hearing impairment. Plaintiff plainly stated that she was requesting a "reasonable accommodation for hearing impairment" and suggested two possible accommodations: one-on-one meetings with Calvanese after group meetings or emails to him summarizing her understanding of any meetings. (Ex. 12.) It is also undisputed that Curtis sent Plaintiff a reasonable accommodation form and told her to bring it to their PIP meeting scheduled for September 7, 2010. It is undisputed as well that, at that meeting, (a) Calvanese told Plaintiff that, as she requested, she could send him emails summarizing meetings and (b) Curtis told her she would forward her request for the use of a CART system to Baystate's ADA department. It is also undisputed that Plaintiff followed up with Curtis by email that same day and that, while Curtis did not give Plaintiff a date by which the ADA department would respond, she told her that she did not need anything further and would let her know if she did. As described, Plaintiff abruptly resigned the next day.

To be sure, Plaintiff now argues that Curtis had a negative demeanor at the meeting and made comments that led her to believe that her request would be denied. For example, as described, Curtis mused that it might be illegal to use the CART recording system without someone's knowledge. Nonetheless, based on their testimony, it is undisputed that neither Curtis, Calvanese nor Plaintiff herself was

familiar with the CART system, that no disciplinary action was taken against Plaintiff, and that the meeting ended with assurances that Plaintiff's request for a CART system would be sent to the ADA department.

Thus, Plaintiff's personal feelings about the tenor of the meeting notwithstanding, the record undisputedly supports Defendants' argument that they reasonably accommodated one of Plaintiff's requests, *i.e.*, the exchange of emails between Plaintiff and Calvanese summarizing their meetings, and in good faith began to process Plaintiff's request for an accommodation in the form of a CART system. *See Calero-Cerezo v. U.S. Dept. of Justice*, 355 F.3d 6, 24 (1st Cir. 2004) (citing *Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997) ("We agree that both parties have a duty to assist in the search for an appropriate reasonable accommodation and to act in good faith.")  These actions on Defendants' part comported with the notion that "a reasonable accommodation is a cooperative process in which both the employer and the employee must make reasonable efforts and exercise good faith."  *Rennie v. United Parcel Service*, 139 F. Supp. 2d 159, 168 (D. Mass. 2001) (quoting *Feliberty v. Kemper Corp.*, 98 F.3d 274, 280 (7th Cir. 1996)).  As the ADA's regulatory scheme provides, "the appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability."  29 C.F.R. pt. 1630 App. § 1630.9 (1997).

By resigning one day after her meeting with Calvanese and Curtis, Plaintiff, unfortunately for her cause, failed "to continue to engage in the interactive process [and] prevented [her employer] from making further attempts to reasonably

15

accommodate her." *Rennie*, 139 F. Supp. 2d at 172-73. *See also Beck v. Univ. of Wis. Bd. of Regents,* 75 F.3d 1131, 1137 (7th Cir. 1996) ("Liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown. But where . . . the employer does not obstruct the process, but instead makes reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed, ADA liability simply does not follow."). Accordingly, Plaintiff's accommodation requests - - for use of a CART system and the use of email summaries of meetings with Calvanese - - could never bear fruit. As a result, the court has little choice but to allow Defendants' motion for summary judgment on her claims concerning accommodation.

B. <u>Real or Perceived Disability Discrimination and Harassment under the ADA and Mass Gen. Laws c. 151B against Defendants(Counts One, Two, and Five)</u>

1. Employment discrimination

To survive a motion for summary judgment on a claim for discrimination under both the ADA and Chapter 151B, a plaintiff has to satisfy the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in which she must first establish a prima facie case of discrimination. *See also Beal v. Board of Selectmen of Hingham*, 646 N.E.2d 131, 136 (Mass. 1995) (adopting the *McDonnell Douglas* framework in discrimination cases brought pursuant to Mass. Gen. Laws c. 151B). To establish a prima facie case of discrimination on the basis of a disability, the plaintiff must demonstrate that (1) she is disabled within the meaning of the ADA and/or Chapter 151B; (2) she is able to perform the essential functions of her

job, with or without reasonable accommodation; (3) she suffered an adverse employment action; and, (4) the adverse employment decision was based in whole or in part on her disability. *Torres-Alman v. Verizon Wireless Puerto Rico, Inc.*, 522 F. Supp. 2d 367, 381 (D.P.R. 2007). Here, the parties agree that Plaintiff is disabled within the meaning of the applicable statutes, but Defendants argue that she cannot establish the remaining elements of her prima facie case.

In the court's view, Defendants make a compelling argument that Plaintiff fails to meet the second element of her prima facie case, namely, that she could perform the essential functions of her job with or without a reasonable accommodation. Because some facts remain disputed, however, the court will assume that Plaintiff was able to perform the essential functions of her job with or without an accommodation. Still, based on the record, the court finds that Plaintiff has not and cannot establish the third and fourth elements of her prima facie case, that she suffered an adverse employment action based in whole or in part on her disability. Accordingly, Plaintiff's employment discrimination claims fail as a matter of law.

An adverse employment action must "materially change the conditions of the plaintiff's employ." *Gu v. Boston Police Dept.*, 312 F.3d 6, 14 (1st Cir. 2002). Here, Plaintiff argues, the adverse employment action at issue is her "constructive discharge" from Baystate on September 8, 2010. Although Plaintiff's memoranda are unclear with regard to this argument, it appears to relate to Calvanese's alleged harassment - - in the form of comments, warnings, and placing her on the PIP - - coupled with his subsequent "denial" of her request for accommodations.

To establish a claim for constructive discharge, a plaintiff must demonstrate that working conditions were "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *GTE Products Corp. v. Stewart*, 653 N.E.2d 161, 169 (Mass. 1995) (quoting *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977)). A plaintiff can meet that burden if, "based on an objective assessment of the conditions under which the employee has asserted [s]he was expected to work, it could be found they were so difficult as to be intolerable." *Id.* Moreover, "in order to amount to constructive discharge, adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." *Id.*

Even viewing the facts in a light most favorable to Plaintiff, the court is unable to conclude - - and, indeed, a jury would be unable to conclude - - that the conditions under which Plaintiff worked or would have continued to work were so intolerable that a reasonable person in her shoes would be forced to resign. First, Calvanese's written warnings did not result in a material disadvantage in Plaintiff's salary, grade or other objective terms and conditions of employment and, therefore, cannot be considered adverse employment actions. *See Castro-Medina v. Procter & Gamble Commercial Co.*, 565 F. Supp. 2d 343, 372 (D.P.R. 2008) (absent material disadvantage with respect to salary, grade, or other objective terms of employment, employee's negative performance evaluation and warnings were not adverse employment actions). Similarly, Plaintiff has not alleged that her one-week suspension in June of 2010 resulted in any material disadvantage to her employment. Plaintiff was paid for the time

she was on administrative leave and, after an investigation found that Plaintiff complied in part with the task she had been assigned, she was returned to her position.

Second, even if the court were to treat certain comments made by Calvanese - - such as "you're not hearing me" and "you're not understanding me," as questionable, they cannot be found to be "objectively offensive" or "sufficiently severe and pervasive," particularly in the context of a discussion regarding Plaintiff's failure to comprehend certain tasks, such that a reasonable person would feel compelled to resign.  *See Lee-Crespo*, 354 F.3d at 45 ("'Constructive discharge' usually refers to 'harassment so severe and oppressive that staying on the job while seeking redress - the rule save in exceptional cases - is intolerable.'") (quoting *Reed v. MBNA Mktg. Sys., Inc.*, 333 F.3d 27, 33 (1st Cir. 2003)).  Similarly, although Plaintiff views the PIP as a disciplinary action, it was, by definition, an improvement plan designed to help Plaintiff meet job expectations; like the written warnings and suspension, the PIP did not result in any material disadvantage in her employment status.  Most importantly, perhaps, the slate had been wiped clean at the time of the September 7, 2010 meeting, which took place shortly after Plaintiff first requested accommodations based on her disability.  To be sure, in answer to a question from Plaintiff after the meeting, Calvanese indicated that, had she not raised her need for a reasonable accommodation, she would have received a final written warning.  But, as it turned out, exactly the opposite happened; Defendants readily acceded to one of her requests and were on the way to addressing the second.  Her resignation a day later came from her free-will and cannot be found by a jury to have been compelled.  *See id.* ("To prove constructive discharge, a plaintiff

must usually show that her working conditions were so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign.") (internal quotations omitted).  *See also Marrero v. Goya of Puerto Rico, Inc.,* 304 F.3d 7, 28 (1st Cir. 2002) (standard for evaluating working conditions is objective and "cannot be triggered solely by the employee's subjective beliefs, no matter how sincerely held.") (quoting *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000)).

In short, Plaintiff has proffered no evidence that she was constructively discharged.  Accordingly, Plaintiff has failed to meet the third and fourth prongs of her prima facie case and the court will allow Defendants' motion with respect to her discrimination claims in Counts One, Two and Five.

2.  Hostile-work environment

Plaintiff also appears to assert disability-based harassment claims under these same three counts as just addressed.  The standards for assessing a claim of disability-based harassment amounting to a hostile work environment are similar to those used in considering whether an employee has been constructively discharged.  In essence, in order to determine whether an environment was objectively hostile, a court must look to "'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Marrero*, 307 F.3d at 18-19 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).

Here, in support of her harassment claims, Plaintiff points to the same actions

described above, namely, comments made by Calvanese, her suspension, and her placement on a PIP.  For reasons explained, these events, all of which were directly related to Plaintiff's performance, not her disability, can only be characterized as "the actions any employer might take to promote better performance from an employee who is demonstrating serious difficulties with her job duties." *Castro-Medina*, 565 F. Supp. 2d at 372-73 (D.P.R. 2008).  In short, there are no material or genuine facts in dispute which could be found by a jury to constitute "severe and pervasive" harassment. Accordingly, the court will allow Defendants' motion for summary judgment with respect to disability-based discrimination under Counts One, Two, and Five.

     C.  <u>Retaliation under Mass. Gen. Law c. 151B and the ADA</u>

In evaluating retaliation claims under the ADA and Chapter 151B, the court again looks to the burden-shifting scheme outlined in *McDonnell-Douglas.*  In sum, to survive a motion for summary judgment, a plaintiff must first establish a prima facie case of retaliation by showing (1) that she engaged in protected activity, (2) that she suffered an adverse employment action, and (3) that a causal connection existed between the two.  *Mole v. University of Massachusetts*, 814 N.E.2d 329, 338-39 (Mass. 2004).  As explained, however, Plaintiff has failed to demonstrate that she suffered an adverse employment action.  The events leading up to her resignation - - a day after her first request for accommodations related to a hearing impairment were addressed by Defendants - - cannot be characterized as a "constructive discharge" under the ADA or Chapter 151B.  *See Lee-Crespo*, 354 F.3d at 45.  Likewise, based on the circumstances, her week-long paid administrative leave, two written warnings, and

placement on a PIP are not, alone or collectively, adverse employment actions as envisioned by either statute; none of those actions has been shown to relate to her hearing impairment or to her exercise of any protected activity. Accordingly, Defendants' motion for summary judgment with respect to Counts Three, Four, and Seven will be allowed.

## IV. CONCLUSION

For the reasons explained, Defendants' motion for summary judgment on Counts One, Two, Three, Four, Five, and Seven are ALLOWED.

IT IS SO ORDERED.

DATED: September 7, 2012


 /s/ Kenneth P. Neiman
KENNETH P. NEIMAN
U.S. Magistrate Judge